and the Wind Tower Trade Coalition, 2023-14-19, Ms. Sugama, when you are ready. Good morning, Your Honors. May it please the Court, Mackenzie Sugama on behalf of Dunkuk Appellant. Our brief set forth the reasons why Commerce's determination was unsupported by substantial evidence. With the Court's permission and subject to any questions, I focused this morning on the main aspects of Commerce's errors. First, Commerce wrongly recalculated Dunkuk's steel plate costs by assigning the same steel costs to wind towers that use different types, different amounts, and different specifications of steel. Now, wind towers are massive structures. They can weigh up to 350 metric tons, and they can be as tall as 150 meters. That's about as tall as the Washington Monument, for reference. Commerce made a determination that the variance in the cost of steel in the use of the wind towers was timing and not physical characteristics, right? Their conclusion is based on an analysis that is not complete. There were problems with that analysis. First, that analysis didn't actually compare the products... But that was the analysis they used. That was the basis of their decision, correct. Now tell us why that was wrong. Right, right. So, it's important to consider the fact that these are wind towers, and that they all have different physical characteristics, quantum characteristics of the finished wind towers. And by Commerce, by weight averaging all of their steel plate costs, they essentially applied the same steel plate costs to towers that are the shortest, the tallest, and the heaviest, all have the same unit cost. But Commerce did that because it found that the steel prices in the use of these products were affected or impacted by timing factors. Right, and that conclusion is based on... Why was that not supported by... That is not supported because that analysis that they had only compared a subset of plate purchases for selected quantums. They didn't compare all of the quantums, steel plate costs. But they took representative samples from different sizes and compared them across that, but also from same size to same size, right? No. So what they compared was the input, the steel plate input characteristics. Well, that's what they need to figure out. No, their requirement is that they compare the physical characteristics of the finished wind towers, not the raw material characteristics. But didn't they take different size steel towers and compare the price of the steel input for each of those? So they're looking at the steel input price for the different types of towers. There's not a correlation between the steel input price and the price of the finished good. If you analyze the steel plate costs based on the finished characteristics, there's... But you're saying that they're looking at the steel input and they're using the price of the steel input and comparing how it factors into the different things. Are you suggesting that somehow the manufacturing costs are different for these different sizes and that's what's driving the difference? Converse's analysis shows that the input costs don't vary that much, but they do when you consider the consumption of the steel plate in the finished wind tower. I don't understand what that means. For example, I think we used the analysis... Are these using different types of steel plate? They are using different types of steel plate, but some wind towers might have a lot of plate. They might have thin plates. They might have thick plates. That's why you have to do an analysis of the finished product. But they did an analysis based on finished products. You just don't like the way they did it, but they looked at different finished wind products, the towers of different sizes, and they compared the underlying steel costs for all of them and determined that the actual size and physical characteristics weren't driving it and the timing was. They didn't group their... Let me ask you that. If that's what they did and that's an okay methodology, then that's supported by substantial outputs, right? No. Their analysis, they compared a subset of plate purchases for only three columns. That doesn't show that the cost...  If you're arguing whether they were exhaustive enough in their comparison, you're going to lose that argument because all they have to show is their methodology was okay and there's some evidence underlying it. So if that's your point, I think you need to move on to another point. What's wrong with that? Hypothetically, if they're looking at this and they pick out the different size wind towers and they compare like-to-like big towers to big towers and then also compare big towers to small towers and they determine that the steel plate, that the prices based on all of that are driven by time, not any of the physical characteristics, then why isn't it permissible to average? It's not permissible to average because commerce's practice is to disregard the actual cost based on the books and records if the variances in costs are not due to the product's physical characteristics. Well, the hypothetical, which is not really a hypothetical, it's what commerce did, is they've determined that the prices aren't due to physical differences, that they're due to time. If the prices are due to time, and I know you dispute that, but if they are, is averaging okay? Well, they haven't ever averaged before based on the fluctuation of the input cost. Answer the question. If commerce has properly determined that the steel input prices here were not changes due to physical characteristics or manufacturing, but were due to the time of purchase, is it then okay under the statute for Congress to average? No, I wouldn't think so because that unravels the whole concept of having quantum characteristics. Because naturally in manufacturing, costs are going to change over time based on the timing and when you purchase the input, and commerce has specifically set up quantum characteristics to understand how costs might change due to the physical characteristics of the goods. In commerce analysis, what they did... I still don't understand your question. Commerce is allowed, if the price change is not due to physical characteristics or manufacturing, they're allowed to select other prices. They don't have to use the actual prices, right? If they determine, if there's differences in the books and records, and they determine that those differences are not due to the physical characteristics of the products. And then what are they allowed to do if they make that determination? Previously, they've been allowed to reallocate costs if it's not due to physical characteristics. And never before have they done that based on timing. Yes, but if they make all the proper determinations, when you say reallocate costs, does that include averaging? I'm sorry, what? Does that include averaging? Reallocate? If they make all the determinations that they have to make under a statute to determine they're not based upon changes in size and stuff, and not due to manufacturing costs, so they're due to something else, you said they're allowed to reallocate costs. Correct. Does that mean averaging? Yes. Okay. Yes. So is your beef here not with the averaging? It's with their determination that the costs here were due to time, not physical characteristics. Correct. They didn't have, the substantial evidence was not there to reallocate the costs because they never determined that the difference in costs were unrelated to the product's physical characteristics. I think they made exactly that determination. You don't like that determination, but that's exactly what they did. So that analysis... I mean, Judge Gordon sent it back one time to make them make it clear. I think we made an analogy in our brief, saying in a house you have a two by four, or two by six, you have all of these different inputs into a house. And within a selected month, those boards might have had the same cost. But when you're comparing a big house and a small house, you have to look at the consumption of all of those boards because they have different quantities, they might have different thicknesses, you have to look at the... Commerce did look at that, did look at those factors, and determined that that's not what affects the price of the steel, what's affecting the price of the steel is our timing. And there are cases, commerce in the past has used sampling methodologies in order to determine, for example, pricing at special holidays, like in the fresh cut flowers cases from Columbia. In those cases, commerce used a sampling methodology in order to address price differences during holidays. So in that analysis that commerce did, they have three different condoms, and they're looking at plate purchases in September, and plate purchases in May. And those don't reflect all of the plate purchases for those condoms. That's just a sample for each month. It doesn't show all the plate that that condom actually needed to be... What requires them to do such an exhaustive look rather than look at representative samples? Because those samples of the inputs don't show the physical characteristics of the end product. They didn't actually group the condoms by weight and height. We did do that analysis, that's on appendix page 2001, and we grouped all the condoms by weight. So they go from the lightest tower to the heaviest tower. And you can see that the shortest tower had the largest variance, because it didn't have as much plate to produce. And when you're looking at the products, the physical characteristics of the finished products... I don't know how that proves that it was... Because it was the shortest tower and had the most variance, that it was due to height rather than variance in steel cost. I mean, it can still be variance in steel cost over time, right? Well, it's speculative to say, well, maybe it's timing... Which is speculative too. This is the whole point. Commerce gets a lot of deference here. They came up with a methodology that you agree, I think, is theoretically okay under the statute as long as the evidence supports it. And they've done some grouping of these different heights, and they've compared... I mean, you can say they didn't do it. What you're saying is you don't like the way they did it. There is evidence that Judge Gordon found, and it's very clear from the briefs about how they did it. And they didn't just look at all the steel for all the different lighthouses all together as one group. They grouped into various things and compared them against each other, but also compared the different types of steel. They didn't group the columns together. There was three columns there. They weren't grouped together by column characteristic. There was no analysis of the heights or the weights. I have a feeling your friends on the other side are going to disagree with you about  Well, just looking at that analysis, it is only a sample of plate purchases. There's no grouping. If your beef is that they used a sample instead of all the inputs and grouped them together, you're going to lose that too. Because there's no reason commerce has to do an absolutely exhaustive look at every single purchase here. They can do a methodology that relies on sampling. Of course. And their methodology should have used the column characteristics as a guidepost. And they didn't. Let's look at the chart on JA-73. You know which one I'm talking to. Why isn't there substantial evidence of cost smoothing? Appendix page 73. Right. This is attachment A. Right. This is their analysis. Let me look at this and see this as substantial evidence in support of commerce's cost smoothing methodology. Right. So we have the sample purchases from September and May. And they're saying that the prices were the same. Although notably, even within May, there is variance. And there's a 5% variance of cost in the month of May. And the input costs themselves fluctuate. Even though Dunko's overall steel plate costs also had a variance between 5 to 6%. And commerce found that that was so distortive. But if the input plate costs vary by 5%, they said that that's identical. Counsel, you're mostly through your rebuttal time. Do you want to save the rest? Oh, yes. You have one minute left. We'll give you two minutes for rebuttal time. Okay. Thank you, Your Honors. Ms. Bay, you're going to take 11 minutes. Yes, thank you, Your Honor. May it please the Court. The trial court correctly determined that commerce's findings were reasonable and supported by substantial evidence. This Court should affirm. I'll start, like Ms. Sugama did, with the smoothing issue. Commerce thoroughly explained and supported, especially in its remand redetermination, its decision to smooth costs or weight average the plate costs across different types of wind towers or condoms to address cost distortions because it found that those distortions were not attributable to the physical characteristic differences, but rather to the timing of the purchases. In its remand redetermination, commerce not only further explained its original findings, comparing costs for steel plate inputs across different condoms in September 2018, but it then conducted additional analysis in response to Donggook's comments. There, it compared four different condoms with different physical characteristics and isolated that time variable to only May 2018, and found that even though there were physical differences in the steel plate, there was very little variation in cost. Commerce then did the reverse, basically concentrating on one condom with the same type of steel plate input and finding that between May and September 2018, the per unit steel plate costs varied, even though the physical characteristics were the same. Let me make sure I understand you. They did two things. They looked at a bunch of different, well, four different condoms, and that means different height and stuff, and weight, whatever, for one specific period of time, and they determined there was not very much variance there, or not enough to worry about. But then they compared a different time period and compared the same, how many condoms did they use for that? So what they did was, as you said, they compared four different condoms in one time period, and then in their original determination, they also compared two different condoms in a different time period, and then in addition to that, they also compared one condom but across two different periods. So they looked at the same type for the two different time periods. Yes. And so from that, they were able to determine that there was no variation between condoms in a certain time period, but across time periods, looking at the exact same condom, which presumably has the same physical characteristics, which can't be driving differences, that there is a variance based upon the time of the sales. That's exactly what happened. Okay. And it seems to me that your friend's argument is that you didn't look at enough data, that you should have looked at more. I mean, is there any requirement that you should have looked at more? I mean, is one enough to determine that the one, the same condom across two pricing periods? Why didn't you look at more than one condom across two pricing periods? Well, I mean, there's a few different answers to that. One is, as this court held in Thai Pineapple, the appellant in that case argued that Commerce also focused on a limited sampling, but the court rejected that argument because there was no evidence or any specific arguments that the sampling biased or corrupted Commerce's analysis. Here also, there's simply nothing on the record that shows, and no specific argument from Dungook that shows that Commerce somehow erred in how it did its sampling. And also, Commerce didn't only use one condom. It only used one condom to compare across time periods, but it looked at four different condoms when it was isolating for the time variable, and then it also looked at two condoms in another scenario where it was isolating for the time variable. And for both of those different periods, you determined that there was no pricing difference or no substantial pricing difference across the different condoms. So for the time periods, there was no difference driven by physical characteristics. Yes, exactly. So I think Commerce looked at both sides of the same coin, and it found that when isolating for time, or when neutralizing for time, but having different physical characteristics, there was still very little variation in price. But when you neutralize for physical characteristics and concentrate only on time, there was a price differential. And between those two, Commerce certainly reasonably found that the cost distortions were not caused by physical characteristics, but rather by time, and therefore enacted its smoothing practice by weight averaging across condoms. So a little bit on a different note, in reaching its constructive value determination, its CV determination, Commerce relied on a 12-month financial statement of the parent company, and part of that information involved aghast sales to the U.S. and only four months data. Explain to me how that was a reasonable determination by Commerce. All right, so Commerce compared, I think, 11 different financial statements, and the only two that are at issue here are the statement of SSHC, which is the statement that Commerce chose, and the statement of Seya Steel, which Donggook is alleging that they should have chosen. Here, Commerce considered four different factors in aligning with this practice, and I don't think Donggook is contesting that those are the factors that Commerce can rely on. And it found that the SSHC ---- These are factors that Commerce has developed and has employed as a practice, correct? Yes, exactly. An agency practice. Yes, and I don't think that Donggook is contesting Commerce's practice in that regard. I think it's concentrating its argument on ---- But one of those factors, just to get to the factors, because we don't have a lot of time, is the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales in the United States. It seems to me that the data that was used by Commerce reflected significant amount of sales to the United States. Well ---- So let's say they violated this particular factor, okay? The third one is contemporaneity of the data to the period of investigation. Here, there was data available for four months of the period of investigation, correct? There was data available for four months in the, say, a steel one, which Commerce elected not to choose, but Commerce explained that because there was only four months rather than an entire year, and, of course, the period of investigation is an entire year, and so Commerce determined that ---- So since we know from the prior argument and your prior arguments on the smoothing of costs, right, and your argument that Commerce has the discretion to smooth costs and to base its decision, why couldn't it have not done a similar type of methodology in this particular case with respect to the four months of financial data that did fit within the period of investigation? Well, I'm not sure exactly how Commerce ---- Why can't it average it over the 12-month period? Well, I think that's exactly the problem. Commerce found that four months is not a good snapshot of a period in time. It's not indicative of a company's realization of profit for an entire year because those four months might not be representative of a full year's worth of profit. And because the period of investigation is a full year, Commerce preferred to use a statement that had a full year's worth of data. So I think the important thing to point out here is that Commerce acknowledged that neither set was exactly perfect. One set, the set that Commerce chose, SSHC, was somewhat over-inclusive. But importantly, it did still reflect sales of comparable merchandise in the home market. It still had some of those sales. It just also had sales outside of the home market. The consolidated data had, what, 92 percent of the reported amounts did not even relate to wind turbines. Yes, but a certain ---- And also there were sales to the United States. How can you include sales to the U.S. in a CV methodology? Because, again, none of these sets of data were perfect, and there were still sales of comparable merchandise within the home market. Not all of the sales were to the United States. But, again, Commerce acknowledged that the SSHC financial statement was somewhat over-broad, included sales outside of the home market. But it also acknowledged that the SAIA steel financial statement was imperfect as well because of the four months of data. And there, Commerce made a reasonable ---- In your view, was there anything else that Commerce could have done? I don't know that Commerce could have done anything else reasonable, given that there were only the 11 statements on the record. It has to select from amongst the statements on the record. And I think, importantly, even if Commerce could have potentially chosen a different option, it does not render its determination in this particular case unreasonable. And I think that's what Judge Gordon at the trial court was trying to get at, which is that even though ---- In view of Commerce's agency practice, just basing constructive value on sales to the U.S., 93 percent of the data that's used does not even involve the product subject to the investigation. And there was other country data that was available at the time. How can you say that that's reasonable? It's reasonable because it still reflected some sales of comparable merchandise that met the criteria that is one of the four criteria that Commerce chooses. These are arguments that Commerce articulated? Well, I mean, Commerce, again, did acknowledge that these financial results included other activities than comparable merchandise. But it also says ---- I understand that it acknowledged that this was odd and not out of its agency practice. But it doesn't explain why it was reasonable. Well, it said it was reasonable because it was the only option on the record that still reflected profits on the production and sale of comparable merchandise and also included a full 12-month snapshot of financial data. And I think that's what's important. Even if Commerce's selection of SSHC wasn't perfect, SAIA Steel also had a very big flaw. And Commerce reasonably determined to find one flaw less important to its determination than the other. And this Court should not reweigh the evidence to determine that it thinks that having a full year's worth of data is less important than having sales that are solely comparable merchandise within the home market. I mean, in your view, on this four-part test that you're applying from whatever that case is, your data fails the prong two, which is it does reflect sales in the United States. But the one they want fails prong three, which is it's not contemporaneous. And when you don't have perfect data, then you have the discretion as long as it's reasonable. Exactly. And that's exactly what Judge Gordon reflected in his decision, which is that SAIA Steel might not have liked that Commerce chose having a full year's worth of data over having sales that are to the United States, but that doesn't render Commerce's decision unreasonable. I see I'm out of time. I'm happy to answer any other questions. Otherwise, we please ask that this Court affirm. Thank you, counsel. We'll hear from Ms. Thorsen. Thank you, Your Honor. I'm Maureen Thorsen of Wiley-Ryan on behalf of the Wind Tower Trade Coalition. Just to pick up on the constructed value-profit and selling expenses argument, I think it's important to point out that in terms of the four-month financial statements of SAIA Steel, wind towers are a product that take a very long time to produce. And Don Cook itself stated on the record that it can take upwards of eight months to produce a single wind tower or a wind tower project. So this, to me at least, provides context for the Commerce Department's rationale for saying four months is not enough of a financial statement for us to feel comfortable with for constructed value-profit given how long it takes to produce the particular good that we're examining here. They're not producing ball bearings, which they can do a million, however many a day. So four months may give you a representative snapshot. A wind tower they may do however many a month. It may be very small. Correct, Your Honor. Let me ask you this, because I assume you're the domestic side, right? Yes. If commerce had gone the other way, would that have been reasonable? I know you would have come in and said not, but do you think that if that four-month period, under the standard, I'm sure you're going to advocate for the other one, but using the proper standard of discretion to commerce, and they determined again it's not a proper fit, and we think in this case it's more important to have similarity of product and no U.S. sales rather than contemporaneous. Would that satisfy the standard? So as Your Honor pointed out, hypothetically, yes, the agency does have quite a lot of discretion here, and this is very similar to what it does in the surrogate value context in non-market economy cases. It's very rare that the agency is going to have surrogate value data sources that are perfect, that are exactly what the doctor called for. So they have to do a balancing act between what have we got on this record. Well, we have this record that arguably has more profits in Korea of comparable merchandise wrapped up into it, but it's only for four months, and this is a product that takes a long time to produce. We would rather have this full-year financial statement that perhaps, yes, does have some profits and sales in the United States in it, but also does have Korean sales of comparable goods in it, so we are comfortable at this point with our choice. Had they gone the other way, we'd have a different case, and I'd probably be on the other side of the courtroom, but the fact that the agency was forced to do a balancing act does not, to me, indicate that they did something unreasonable here. It's just the name of the game when looking at these very distinct different types of financial statements that different parties who want their own way, of course, place before the agency for consideration. And just to finish up with the plate costs issue, as you've heard, the main thrust of Appellant's argument is that the agency should have been looking at extended plate costs per conum, taking into account the consumption rate. I believe they actually did do that. Their original analysis in their preliminary decision memorandum at page 1382, I believe, does take that into account, but beyond that, to the extent that Don Cook is challenging Commerce's analysis of variations in per ton plate costs across conums at pages 4 and 8 of its reply brief, it doesn't take into account the additional analysis in the final and remand redeterminations, and it also rests its argument on the idea that Commerce was basing its decision on an outlier conum. Commerce addressed that argument very well at appendix pages 67 and 68. And for that matter, the conum that Don Cook characterizes as an outlier is far from the only one that displayed variability under either Don Cook or Commerce's analytical methodology. And I see I'm out of time here. Wouldn't you say that at the end of the day that the analysis involved here is tracking profit experience to the subject merchandise? I'm not sure I understand the question. Okay. So let's look at this a different way. The statute puts the emphasis on looking at information or financial data that's related to the products under investigation. Oh, is this for the constructed value profit? Yes. Okay. Sorry, I got a little bit confused. Okay. So it's related to the subject merchandise. Well, as Don Cook itself has argued, the point is to come up with a proxy or surrogate for the experience of. What does the statute require? Does the statute require? Yes. It requires you to find a constructed value profit for use in determining what. And it's got to represent the activity, financial activity. Experience of the respondent. Right. So if you're using financial data and it does not, 92 percent of it does not involve, it sells data, selling costs, administrative costs. Again, that's a flaw, but both of the statements that were put in front of the agency that the parties were advocating for had flaws. And for that matter, I'd point out, very similar again to the surrogate value context when we look at surrogate value financial statements. You're trying to come up with a statement that reasonably approximates the experience of the subject producer. Here, Don Cook itself didn't just produce wind towers. They produced other goods. They had service activities. And they derived a substantial amount of their revenue as a company from sales in the U.S. market as shown by the fact that they didn't have home market viability and had to go to third country sales. Thank you, Your Honor. Thank you, Counsel. Ms. Fugama has a couple of minutes for rebuttal. Thank you. Thank you, Your Honors. Our first point on rebuttal is the fact about the long lead types of wind towers. But SEA produces steel pipe. That is a commodity. They're not producing wind towers. So that won't be factored into their four months of financial data. And their financial data is contemporaneous with the POI. It was from September to December of 2018. The POI was from July to June 2018 to June 2019. And the 12 months of financial data of the SEA group was the calendar year of 2018. So there is no doubt that SEA consolidated statements were contemporaneous. And the statute... I'm sorry, that the consolidated statements were what? Contemporaneous with the POI. The statute does not have a timing requirement at all. The statute just requires that Commerce find an alternative for profits realized in connection with the sale. Wait, the statute doesn't, but the pure magnesium test does. You're not here arguing that that's the wrong test, are you? No, but the magnesium test has said they should be contemporaneous, and these statements are contemporaneous with the POI. And second... But only part of the POI. They are entirely contemporaneous with the period of investigation. But they're not 12 months, there's four months. I mean, you're not quibbling that 12 months of data is better than four months of data, are you? Well, we're calculating ratios. So just within that four months, SEA had revenue that was four times the amount of revenue that Dunkirk had. And to correct something else that opposing counsel said, Dunkirk is primarily a manufacturer of wind towers. So that is where they are deriving their revenue from. And the SEHA group statements only reflected... 7% of their sales revenue reflected sales in Korea of comparable merchandise. And as the government noted, these were overly inclusive, and they were overly broad, and it was not reasonable for Commerce to rely on these statements when the consolidated statements on the record met all four of the department's criteria. Counsel, as you can see, your time has expired. Yes, thank you. Thank you both for cases submitted.